IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 16, 2001 Session

## SARAH WHITTEN, Individually and d/b/a CENTURY 21 WHITTEN REALTY v. DALE SMITH, ET AL.

**From the Appeal from the Chancery Court for Hardin County**
**No. 5875; The Honorable Ron E. Harmon, Chancellor**

---

### No. W2001-01347-COA-R3-CV - Filed February 27, 2002

---

This is a suit for the failure to pay a real estate commission. The Appellant filed a complaint against the Appellees in the Chancery Court of Hardin County. The Appellees filed a motion to dismiss for lack of subject matter jurisdiction and improper venue. The trial court denied the motion to dismiss. The Appellees filed an answer and counter-complaint. A trial was held on the complaint and counter-complaint. The trial court entered an order finding that the Appellees did not owe the Appellant a real estate commission and dismissing the counter-complaint.

The Appellant appeals the order of the Chancery Court of Hardin County finding that the Appellees did not owe the Appellant

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

Terry L. Wood, Corinth, MS, for Appellant

Ed Neal McDaniel, Savannah, TN, for Appellee

### OPINION

#### I. Facts and Procedural History

The Appellant, Sarah Whitten ("Ms. Whitten"), is a real estate broker and the owner of Century 21 Whitten Realty ("Whitten Realty"). The Appellees, Dale and Emma Smith ("the Smiths"), owned a house and an adjoining single tract of land on Perkins Street in Adamsville, Tennessee. The Smiths met with an agent of Ms. Whitten, Charlotte Adams ("Ms. Adams"), concerning their decision to sell their house and approximately twenty acres of land ("the property"). On March 31, 1999, the Smiths entered into an Exclusive Right to Sell Residential Listing

Agreement ("the Agreement") with Whitten Realty that ran from April 1, 1999 through September 1, 1999. The Agreement provided that "if within 12 months after the termination of this agreement I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission." The selling price for the property was $128,000.00.

After obtaining the Agreement, Ms. Adams placed several signs in the immediate area of the Smiths' property. Ms. Adams also began advertising the property in the newspaper and on the internet. Whitten Realty showed the property to several people during the period of the Agreement. There were two offers to purchase the property during the period of the Agreement but neither of the offers followed through. During the period of the Agreement, Ralph Amos ("Mr. Amos"), a longtime friend of Ms. Whitten and a neighbor of the Smiths, contacted Ms. Whitten to inquire about the price of the property. Mr. Amos informed Ms. Whitten that the property was priced too high, and he never made an offer on the property. Whitten Realty never showed the property to Mr. Amos or his wife, Susan Amos ("Mrs. Amos," collectively "the Amoses").

The Agreement expired on September 1, 1999. The Smiths refused to relist the property with Whitten Realty but allowed the Whitten Realty sign to remain on their property. In December, 1999, Mr. Amos contacted the Smiths about purchasing the property. The Smiths agreed to sell the property to the Amoses for $120,000.00. The Smiths informed Whitten Realty that they intended to sell the property to the Amoses. On January 12, 2000, Ms. Whitten sent a registered letter to the Smiths informing them that Mr. Amos was a prospect of Whitten Realty. Ms. Whitten stated that if the Smiths sold the property to the Amoses, the Smiths owed Whitten Realty a ten percent commission. On January 20, 2000, the Smiths transferred the property by warranty deed to the Amoses. The Smiths refused to pay the ten percent commission to Whitten Realty.

On July 14, 2000, Ms. Whitten filed a complaint for breach of contract against the Smiths in the Chancery Court of Hardin County. The complaint alleged that the Amoses were prospects procured by Whitten Realty under the terms of the Agreement and that the Smiths owed Whitten Realty a real estate commission. On July 25, 2000, the Smiths filed a motion to dismiss for lack of subject matter jurisdiction and improper venue. On October 4, 2000, the trial court denied the motion to dismiss. On October 10, 2000, the Smiths filed an answer and counter-complaint against Ms. Whitten. On November 6, 2000, Ms. Whitten filed an answer to the counter-complaint.

On April 4, 2001, the trial was held on the complaint and counter-complaint. The testimony of the witnesses at trial was highly controverted. Ms. Adams testified that prior to the expiration of the Agreement, she twice informed the Smiths that Ms. Whitten was working with the Amoses concerning the property. Ms. Whitten testified that Mr. Amos went to her office and told her that he was interested in that particular property. She claimed that she quoted him the price of the property as $128,000.00. Ms. Whitten stated that Mr. Amos told her to keep him informed about the property. She testified that she called Mr. Amos on several occasions and went to see Mrs. Amos concerning the property. Ms. Whitten also stated that Mr. Amos went to her office on two or three occasions to check on the status of the property. She claimed that prior to the expiration of the

Agreement, she informed the Smiths that Mr. Amos was interested in the property. Ms. Whitten testified that she considered Mr. Amos a prospect.

Mr. Amos testified that prior to the property being listed with Whitten Realty, Mrs. Amos and her sisters looked at the property. He agreed that his interest in the property and the reason that he inquired about the property was because it was listed with Whitten Realty. Mr. Amos stated that he did not remember how he knew the property was listed with Whitten Realty. He testified that he either called or stopped by Whitten Realty on one occasion to make inquiries about two different properties, including the Smiths' property. Mr. Amos stated that as best he could remember, Ms. Whitten quoted him a price for the property in excess of $150,000.00, and he told her he was not interested in the property at that price. He claimed that he had a two or three minute conversation about the property with Ms. Whitten and did not remember speaking with Whitten Realty about that property again. Mr. Amos testified that he did not remember telling Ms. Whitten to keep him advised about the status of the property. He stated that to his knowledge, no one from Whitten Realty contacted Mrs. Amos about the property. Mr. Amos claimed that he did not remember whether the Smiths asked him if he had spoken with Whitten Realty about the property. He stated that he would not have told the Smiths that he had no contact with Whitten Realty. Mr. Amos testified that he never considered himself a prospect procured by Whitten Realty.

Mr. Smith testified that Mrs. Amos and her sisters looked at the property several times prior to the Smiths' decision to list the property with Whitten Realty. He claimed that he discussed the property several times with Mrs. Amos' sister, Lee Winters. Mr. Smith stated that prior to listing the property with Whitten Realty, Mrs. Amos and her sisters decided not to purchase the property. He testified that after he received the January 12, 2000 letter from Ms. Whitten, he asked Mr. Amos whether he had made any contact with Whitten Realty regarding the property. The Smiths each claimed that the Amoses told them they had made no contact with Whitten Realty regarding the property. They each testified that Whitten Realty never informed them that the Amoses were interested in the property.

Following the close of the proof, the trial court concluded that the Amoses were not prospects procured by Whitten Realty, stating:

> Prospect is the key word. . . . And degree, I suppose, is what this whole matter boils down to. Everyone who read the Courier or drove by there and saw the sign was, in some way, affected by Ms. Whitten's effort, by Ms. Adams' effort. They knew the property was for sale if they noticed the sign. So she had done something toward the sale of that property. Is it enough to earn a commission? I don't think so. Lots of people who read the paper and saw the sign make further inquiry, which to me is the next step up the ladder. Let's see what the property is, a little more about it, find out what it's going to take to buy it. Is an inquiry enough to earn a commission? I don't think so. To me, if a person is going to be a prospect, it has to be someone who has evidenced or made some

-3-

effort to purchase. . . . If Mr. Amos was a prospect, as we want to say he was today, then the Realtors dropped the ball not selling it to him. You know, I can't see how he was such a good prospect at the time – or they would have pursued him. So for all of those reasons, Counselors, I don't think we have a buyer here who came close enough to be considered a prospect as contemplated by this agreement.

On April 4, 2001, the trial court entered an order finding that the Amoses were not prospects procured by Whitten Realty under the Agreement. The trial court found that the Smiths did not breach the contract and did not owe Whitten Realty a real estate commission. The trial court dismissed the counter-complaint. This appeal followed.

## II. Standard of Review

The standard of review for a non-jury case is *de novo* upon the record. See Wright v. City of Knoxville, 898 S.W.2d 177, 181 (Tenn. 1995). There is a presumption of correctness as to the trial court's factual findings, unless the preponderance of the evidence is otherwise. See TENN. R. APP. P. RULE 13(d). For issues of law, the standard of review is *de novo*, with no presumption of correctness. See Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn. 1996). In this regard, when a conflict in testimony requires the trial court to make a determination regarding the credibility of a witness or witnesses, such a determination is "binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary." Hudson v. Capps, 651 S.W.2d 243, 246 (Tenn. Ct. App. 1983).

## III. Law and Analysis

The sole issue presented for our review is whether the trial court erred by determining that the Amoses were not prospects procured by Whitten Realty under the Agreement. The Smiths agreed to pay Whitten Realty a ten percent commission if they sold the property to a prospect procured by Whitten Realty within twelve months after termination of the Agreement. Thus, it is necessary to determine the meaning of the phrase "prospect procured" and to determine whether the Amoses fall within that phrase's definition. When resolving contract disputes, contracts must be enforced according to their plain terms. See Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578, 579 (Tenn. 1975) (citing Eleogrammenos v. Standard Life Ins. Co, 149 S.W.2d 69 (Tenn. 1941)). "[T]he language used must be taken and understood in its plain, ordinary and popular sense." Id. (citing Guardian Life Ins. Co. v. Richardson, 129 S.W.2d 1107 (Tenn. Ct. App. 1939)). The term "prospect" is defined as "a potential or likely customer, client, etc." Random House Unabridged Dictionary, (2nd ed. 1993). The term "procure" is defined as "[t]o initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect or cause. To persuade, induce, prevail upon, or cause a person to do something. . . . To bring the seller and the buyer together so that the seller has an opportunity to sell." Black's Law Dictionary, (5th ed. 1979).

Several cases in Tennessee have discussed the meaning of the terms "prospect" and "procured" in determining whether a real estate commission is owed in a particular situation. In Pacesetter Properties, Inc. v. Hardaway, 635 S.W.2d 382 (Tenn. Ct. App. 1981), the court of appeals held that a real estate broker "procures" the sale of property when the broker produces a customer who is "able, willing and ready to deal on terms satisfactory to his principal." Id. at 388. The court further explained this statement as follows:

> This is generally evidenced by a written offer on terms previously named by the principal. It is generally the duty of the agent to persuade the buyer to agree to all requisite terms and conditions. If he fails to do so within the agreed time, or within a reasonable time, then he has failed to qualify for compensation. When the agent fails to finalize the deal after reasonable opportunity to do so, then the principal may negotiate further, through another agent or directly himself, and if a contract results, the first agent may not claim a commission.

Id. at 388-89.

The court also stated that a mere introduction by a broker's customer to the seller does not entitle the broker to a real estate commission. See id. at 389-90. Rather, the court held that "[t]he rights of the agent are limited to those transactions of which his efforts are found to be the efficient, procuring cause." Id. at 390.

In Cook v. Consolidated Stores Corp. No. 01A01-9605-CH-00245, 1998 WL 684590, *1 (Tenn. Ct. App. July 1, 1998), the court of appeals again reiterated that a broker is not entitled to a real estate commission "merely because he or she introduced the parties or showed property unsuccessfully to the ultimate purchaser." Id. at *4 (citing Miller v. Jones, 387 S.W.2d 627, 630 (Tenn. Ct. App. 1964)). Citing Pacesetter, the Cook court stated that a broker is not entitled to a real estate commission if he "abandons the listing or fails to furnish a ready, willing, and able purchaser during the term of the agency." Id. (citing Pacesetter, 635 S.W.2d at 388-89; Miller, 387 S.W.2d at 630)). The Cook court held that in such a situation, the seller may sell the property "to a prospect who originated with the broker." Id. (citing Pacesetter, 635 S.W.2d at 388-89; Miller, 387 S.W.2d at 630)).

In Crunk v. Molina, 1989 WL 106968, *1 (Tenn. Ct. App. Sept. 18, 1989), Mr. and Mrs. Molina listed their home under an open listing agreement with the real estate offices of Crunk Real Estate and Austin Real Estate. See id. at *1. The open listing agreement signed with Crunk Real Estate provided that Mr. and Mrs. Molina owed a six percent commission in the event they sold the property to a prospect of Crunk Real Estate. See id. Mr. and Mrs. Cheaves went to Austin Real Estate and inquired about purchasing a home. See id. Austin Real Estate showed Mr. and Mrs. Cheaves pictures of several homes including Mr. and Mrs. Molina's home. See id. Two days later, Mr. and Mrs. Cheaves went to Crunk Real Estate. See id. Crunk Real Estate showed Mr. and Mrs.

Cheaves several homes including Mr. and Mrs. Molina's home. See id. Mr. and Mrs. Cheaves made an offer to purchase Mr. and Mrs. Molina's home. See id. Mr. and Mrs. Molina declined Mr. and Mrs. Cheaves' offer but made a counter offer. See id. Mr. and Mrs. Cheaves rejected Mr. and Mrs. Molina's counter offer. See id. Two days later, Mr. and Mrs. Cheaves returned to Austin Real Estate and made an offer to purchase Mr. and Mrs. Molina's home. See id. Mr. and Mrs. Molina accepted the offer. See id.

Crunk Real Estate demanded Mr. and Mrs. Molina pay the real estate commission. See id. Mr. and Mrs. Molina refused to pay the real estate commission to Crunk Real Estate. See id. Crunk Real Estate filed a breach of contract action against Mr. and Mrs. Molina. See id. Both parties filed motions for summary judgment. See id. The trial court granted summary judgment in favor of Crunk Real Estate. See id. Mr. and Mrs. Molina appealed. See id. In its recitation of the facts, the court of appeals stated:

> [T]he Cheaves went to Crunk and were shown the Molinas' home. This is the first time that the Cheaves were actually taken to the home. The Cheaves made an offer to purchase the home and the Molinas made a counter-offer. *At this point*, the Cheaves were clearly potential clients or customers and thus were Crunk's prospects for this particular home. Although the Cheaves visited Austin . . . and were shown pictures of several homes, including the Molinas' home, there is no evidence to support a finding that the Cheaves became interested in the Molinas' home at that point. Therefore, based on the language of the contract and the determination that the Cheaves were prospects of Crunk, Crunk is entitled to a commission on the sale of the home under the contract.

Id. at *3 (emphasis added).

In the case at bar, Ms. Whitten argues that the Amoses were prospects procured by Whitten Realty because they were potential customers who made inquiry about the property as a result of Whitten Realty's efforts. We disagree. The relevant cases hold that introducing the potential buyer and seller, showing the potential buyer pictures of the property, or showing the property unsuccessfully to the potential buyer are wholly insufficient to establish that a broker was the "efficient, procuring cause" of the sale of the property. In addition, we find that a mere inquiry to the broker as to the price of the property does not evidence a buyer "able, willing and ready to deal on terms satisfactory to [the seller]." According to Mr. Amos' testimony, he made one inquiry as to the price of the property during the term of the Agreement. He informed Ms. Whitten that he was not interested in the property at that price and did not make an offer on the property. Whitten Realty never showed the property to the Amoses. Thus, the evidence does not support a finding that Whitten Realty was the "efficient, procuring cause" of the sale of the property to the Amoses. Accordingly, we agree with the trial court's determination that the Amoses were not prospects procured by Whitten Realty, and we affirm the trial court's decision finding that the Smiths did not owe Whitten Realty a real estate commission.

## IV. Conclusion

For the foregoing reasons, the decision of the trial court is affirmed. Costs of this appeal are taxed against the Appellant, Sarah Whitten, individually and d/b/a Century 21 Whitten Realty, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE